UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ELIAS CUSTODIO, | |
| Plaintiff, | Case No. 1:13-cv-00332-BLW |
| vs. | **MEMORANDUM DECISION AND ORDER** |
| IDAHO STATE BOARD OF CORRECTIONS, DIRECTOR IDAHO STATE DEPARTMENT OF CORRECTIONS, BRENT REINKE, IDAHO STATE COMMISSION OF PARDONS AND PAROLES, OLIVIA CRAVEN, COUNSELOR SONNIER, MRS. SAADE, | |
| Defendants. | |

Pending before the Court in this prisoner civil rights matter are two Motions for Summary Judgment with a Joinder in the first Motion, filed by Defendants (Dkt. 31, 42, 44), and Plaintiff's Motion to Allow Service by Publication or to Allow Re-Service by the United States Marshal's Office. (Dkt. 49.) These matters are now ripe for adjudication.

Having fully reviewed the record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, the Court will

**MEMORANDUM DECISION AND ORDER - 1**

decide this matter on the written motions, briefs and record without oral argument. D. Idaho L. Civ. R. 7.1(d).

### DEFENDANT SAADE'S MOTION FOR SUMMARY JUDGMENT: EXHAUSTION OF ADMINISTRATIVE REMEDIES

**1.     Introduction**

Plaintiff was permitted to proceed on the following claims in his Complaint: (1) a First Amendment free speech claim against Jaune Sonnier in her personal capacity and against Brent Reinke in his official capacity; (2) a Fourteenth Amendment equal protection claim against Ms. Sonnier in her personal capacity and against Brent Reinke in his official capacity; (3) a First Amendment free speech claim against Barbara Saade in her personal capacity; (4) a First Amendment freedom of association claim against Ms. Sonnier in her personal capacity; and (5) an Eighth Amendment cruel and unusual punishment claim for failing to permit Plaintiff exercise over a prolonged period of time against Ms. Sonnier in her personal capacity.

In the first Motion for Summary Judgment, Barbara Saade, who is joined by Brent Reinke, argues that Plaintiff failed to exhaust his administrative remedies as to Claim (4) against Saade.

**2.     Standard of Law**

The Prison Litigation Reform Act of 1995 ("PLRA")[1] requires a prisoner to exhaust all available administrative remedies within the prison system before he can include the claims in a new or ongoing civil rights lawsuit challenging the conditions of

---

[1]     Pub. L. No. 104-134, 110 Stat. 1321, *as amended*, 42 U.S.C. § 1997e, *et seq.*

confinement. 42 U.S.C. § 1997e(a); *Cano v. Taylor*, 739 F.3d 1214, 1220-21 (9th Cir. 2014) (a claim may be exhausted prior to filing suit or during suit, so long as exhaustion was completed before the first time the prisoner sought to include the claim in the suit). "Proper" exhaustion of administrative remedies is required, meaning that the prisoner must comply "with [the prison's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). The exhaustion requirement is based on the important policy concern that prison officials should have "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Id.* at 204. Once in court, defendants have the right to bring motions addressing exhaustion of administrative remedies at the beginning of litigation, and "disputed factual questions relevant to exhaustion should be decided at that time. *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (en banc). The issue of "[e]xhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim." *Id.* at 1170.

The defendant bears the ultimate burden of proving failure to exhaust. *See Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). If the defendant initially shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth evidence "showing that there is something in his particular case that made the existing and

**MEMORANDUM DECISION AND ORDER - 3**

generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172.

Confusing or contradictory information given to a prisoner is relevant to the question "of whether relief was, as a practical matter, 'available.'" *Brown*, 422 F.3d at 937. Administrative remedies will be deemed unavailable and exhaustion excused if the inmate had no way of knowing the prison's grievance procedure, if the prison improperly processed an inmate's grievance, if prison officials misinformed an inmate regarding grievance procedures, if the inmate "did not have access to the necessary grievance forms within the prison's time limits for filing the grievance," or if prison staff took any other similar actions that interfered with an inmate's efforts to exhaust. *Albino*, 747 F.3d at 1173.

Failure to exhaust is an affirmative defense that may be asserted in a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim only if the prisoner's failure to exhaust is clear from the face of the complaint and any public records subject to judicial notice. *Albino*, 747 F.3d at 1166. When either party relies on evidence beyond the pleadings and public records, the exhaustion issue should be determined as a matter of summary judgment under Rule 56. *Id.* at 1170. "If the record is sufficiently developed to permit the trial court to consider summary judgment, and if the court finds that when viewing the evidence in the light most favorable to a moving party the movant has not shown a genuine dispute of fact on the issue of exhaustion," the Court may enter summary judgment for either the moving or the nonmoving party. *Id*. at 1176;

**MEMORANDUM DECISION AND ORDER - 4**

*see* Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant.")

Rule 56 prohibits the courts from resolving genuine disputes as to material facts on summary judgment. If a genuine dispute exists as to material facts relating to an exhaustion defense, the motion should be denied, and the "disputed factual questions relevant to exhaustion should be decided by the judge, in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue." *Albino*, 747 F.3d at 1170-71. *See Lake v. Lake*, 817 F.2d 1416, 1420 (9th Cir. 1987) (the court has the discretion to take evidence at a preliminary hearing to resolve any questions of credibility or fact, and the plaintiff must establish the facts by a preponderance of the evidence, just as at trial).

If a prisoner has failed to exhaust available administrative remedies, the appropriate remedy is dismissal without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled in part on other grounds by Albino*, 747 F.3d 1162.

**3.      IDOC Grievance Process**

During the time period in question, the Idaho Correctional Center (ICC), the facility where Plaintiff was incarcerated, was operated by Corrections Corporation of America (CCA), under contract to the Idaho Department of Correction (IDOC). ICC followed IDOC's grievance procedures. (Linda Sevison Declaration, Dkt. 31-4, ¶7.) There are three stages in the IDOC grievance process. First, an inmate with a concern must seek resolution of the problem by filling out an offender concern form, addressed to a staff person capable of resolving the issue. If the issue cannot be resolved through the

**MEMORANDUM DECISION AND ORDER - 5**

use of a concern form, the inmate must then file a grievance form. The grievance is then resolved by a Level 1 Initial Response, which is reviewed by a Level 2 Reviewing Authority Response, and then returned to the inmate. If the grievance did not resolve the issue satisfactorily, the inmate must file an appeal, which is reviewed and decided by a Level 3 Appellate Authority Response. When all three of these steps—concern form, grievance form, and grievance appeal—are completed, the administrative grievance process is exhausted. (*Id.,* ¶ ¶ 9-16.)

Defendant summarizes the details of the grievance procedure as follows:

> Most things could be grieved, except for disciplinary offense reports, alternative sanctions that an offender had agreed to, sentencing, previously exhausted issues and outside problems beyond the control of the prison. (SOF, ¶ 5.) Grievances were also subject to various requirements. For example, an inmate could only complain of one issue at a time, and could have no more than three pending grievances. (*Id.*) A properly submitted concern form, grievance form, and appeal of the grievance would allow prison staff to identify and appropriately address the issue raised therein, and thus reduce the need for litigation, as is contemplated by the PLRA. If an issue was not brought up in the grievance process, it generally could not be addressed. Information contained in a grievance was therefore required to be sufficient to let staff know what the problem was so that it could be evaluated and, if necessary, remedied. Thus, inmates were required to describe the nature of the complaint, dates, places, names of personnel involved, how the offender had been adversely affected, and include a suggested solution. (*Id.*) Inmates were also expected to be civil and respectful in doing so. (*Id.*)

(Defendant's Memorandum, Dkt. 31-2, p. 6.)

If an inmate failed to comply with these rules, the grievance or appeal would be returned to him without action, attached to rejection form, called a "Grievance Transmittal Form." The inmate could then correct the error and resubmit a corrected form. (IDOC Grievance Procedures, Dkt. 31-9, p. 13.)

**MEMORANDUM DECISION AND ORDER - 6**

It is also important to know that there are several administrative forms and practices involved in the grievance system. The grievance/appeal form can be used for either a grievance or an appeal, depending on which box on the form is checked. The handwritten grievance form has a section entitled "For Administrative Use," where the grievance coordinator should write in the date it was received, the number it was assigned, and the date it was answered. It appears that this part of the form is no longer used, because the grievance coordinator instead transcribes the content of the handwritten grievance into an electronic database, where the administrative information is added.[2]

If a grievance or appeal is rejected, it is nevertheless assigned a number so that it can be tracked in the electronic system, and a rejection form is issued to the inmate. While the rejected grievance is to be attached to the rejection form, there is nothing on the face of the form to indicate which grievance is attached. This is important in litigation, especially with an electronic docketing system, where documents that were originally physically attached to other documents are more difficult to track and verify.

An appeal of a grievance is assigned a different number than the original grievance number, and so these two numbers must be tracked together to determine complete exhaustion of a claim. An electronic grievance log called an "Offender

---

[2]     The mix of handwritten and electronic forms and electronic recordkeeping creates several problems when the forms are not cross-referenced. Nowhere on the rejection form or the electronic grievance form is the date the grievance was submitted; similarly, nowhere on the handwritten grievance form is the date it was received. The grievance number is rarely written on the handwritten form. The Court requires parties to submit the handwritten forms, because the re-creation of the form into an electronic version is not always accurate. For example, in one handwritten form, Plaintiff wrote that Saade is "hiding behind the color of authority," but Saade misstated that phrase in the electronic grievance as "hiding behind the odor of authority." (Compare Dkt. 31-15, p. 72 with Dkt. 31-15, p. 57.) Substantive phrases could also be misstated. In addition, the policy does not require the grievance coordinator to transcribe the entire content of the grievance when it has been rejected. This makes it especially difficult to determine which grievance was originally attached to which rejection form.

**MEMORANDUM DECISION AND ORDER - 7**

Grievance Report" tracks every grievance and appeal that the grievance coordinator receives (including rejected grievances), as well as the disposition of each. (Dkt. 31-15, pp. 2-3.)

## 4.     Background

As part of Plaintiff's rehabilitative process, the Idaho Commission of Pardons and Parole (ICPP) required Plaintiff to participate in the prison's Therapeutic Community Program (TCP). Plaintiff was granted an open tentative parole date by the ICPP, conditioned upon completion of the TCP.

Plaintiff alleges that he was not able to complete the TCP, because he was removed when the counselor in charge of the program, Defendant Sonnier, found his language unacceptable, which was his explanation that he "was not a 'gay,' or homosexual. That [he] was a straight guy." (Complaint, Dkt. 3, p. 4.) In his Grievance, Plaintiff explained that, when he was on the "hot seat," and inmates questioned him about what he meant by being a 'straight up, solid man," he responded that he was not a "queer" or a "punk." (Dkt. 3-1, p. 6.)

Plaintiff alleges that Defendant Sonnier is a lesbian, and that she became angry, slapped the wall, and said, "that makes my blood boil." (Complaint, Dkt. 3, p. 4.) Defendant Sonnier removed him from the TCP and placed him in segregation and issued a disciplinary offense report (DOR) for his language. Plaintiff sought to be reinstated in the program or to be assigned to a different counselor, but he was denied that opportunity.

**MEMORANDUM DECISION AND ORDER - 8**

Plaintiff alleges that Defendant Sonnier compelled him "to be subjected to homo-sexual life-styles and innuendos that were demeaning to [him]" within the program and denied his right to free association and visitation with his family and his right to exercise. (Dkt. 3, pp. 5-6.)

As to Defendant Barbara Saade, the prison grievance coordinator, Plaintiff alleges that, when he tried to grieve the issues, Defendant Saade "subverted" the grievance procedure and rejected his grievances for reasons such as failure to include dates of incidents. Plaintiff alleges that Saade's motive was to protect the TCP, because Plaintiff was attempting to "alert the state of the mistreatment [he] receive[d] while in there." (Grievance Form IC 120001426, Dkt. 34-1, p. 2.)

5.    **Discussion**

For the following reasons more fully described herein below, the Court concludes that Defendant Saade's Motion for Summary Judgment will be granted.

A.    <u>**Grievance of August 21, 2012 (No. IC 120001157)**</u>

On August 16, 2012, Plaintiff submitted an offender concern form complaining of punishment and maltreatment after being in the TCP for 37 days. (Dkt. 31-15, p. 70, duplicated at p. 78.) On August 21, 2012, Plaintiff followed his offender concern form with submission of a grievance form complaining that he was being subjected to cruel and unusual punishment and maltreatment in TCP after 37 days, and that he was removed from the program after "wholeheartedly participating" in it. (Dkt. 31-15, p. 69, duplicated at p. 77.)

**MEMORANDUM DECISION AND ORDER - 9**

The handwritten grievance was deemed "received" on September 4, 2012, the date it was entered into the electronic grievance system. (Dkt. 31-15, p. 14.) The failure of the grievance coordinator to complete the "for Administrative use" parts of the original grievance form leaves the actual receipt date of the handwritten grievance a mystery. The grievance was rejected for not containing specific information such as dates, places, and names, and for not describing the problem in the appropriate area (exceeding the space designated for writing comments is also not permitted). A review of this form shows that Plaintiff wrote "August 21, 2012," as the date the form was submitted (not the dates the incident took place) and wrote "after 37 days in the T/C," but he did not indicate the dates he was actually in the TCP, or the date he was removed from the TCP. Plaintiff described the problem in the appropriate area of the form, but exceeded the space only slightly, with two or three letters or symbols running into the margin on several lines.

### B.   <u>Grievance of September 4, 2012 (No. IC 120001230)</u>

On September 4, 2012, Plaintiff wrote a grievance that he was being denied rehabilitation programs and being subjected to cruel and unusual punishment. He stated that he was removed from the TCP and thrown in "the hole"; he also remarked, "here I am," indicating that he was still in segregation, but he did not include the dates of the incidents of which he complained. (Dkt. 31-15, p. 74.)

On September 16, 2012, the grievance was entered into the electronic system as "received," and on September 17, 2012, it was rejected, because it did not include dates and it brought up more than one issue. The grievance was issued a number, IC 120001230. (Dkt. 31-15, p. 73 (rejection form); Dkt.31-15, p. 16-17 (electronic grievance

MEMORANDUM DECISION AND ORDER - 10

form).) It is unclear whether this is a revision of the first grievance, but, in any event, it did not correct or resolve the issue that Plaintiff did not include the dates of the incidents that were the subject of the grievance.

### C.   Grievance of September 24, 2012 (No. IC 120001303)

The grievance of September 24, 2012, is the first grievance that complains of Defendant Saade subverting the grievance process. (Dkt. 31-15, p. 72.) There is no indication on the original handwritten form that it was assigned Grievance number IC 120001303, but the Court is able to match the date of the electronic grievance form (Dkt. 31-15, pp. 20-21) because the typed "problem" section seems to match to the handwritten grievance content, and the notation that it was returned because there was no date of incident seems to match up to the rejection form. (Dkt. 31-15, p. 71.) Plaintiff was told that he had to provide the "grievance #s and dates" of the grievances that Saade allegedly subverted.

### D.   Appeal of Decision on No. IC 120001303 - November 1, 2012 (IC 120001426)

Plaintiff filed an appeal of his grievance that Saade was subverting the grievance process. (Dkt. 31-15, p. 59.) It was assigned number IC 120001426. The appeal was denied on the merits at Level 2, and then at Level 3 by Warden Wengler, on November 24, 2012. (Dkt. 31-15, pp. 60-61.)

### E.   Grievance of October 22, 2012 (No. IC 120001427)

This electronic grievance form, dated October 22, 2012, seems to match up to the same September 4, 2012 handwritten grievance that was the subject of rejected electronic

**MEMORANDUM DECISION AND ORDER - 11**

Grievance number IC 120001230 (that he was being denied rehabilitation programs and being subjected to cruel and unusual punishment), discussed in Section B, above. (Dkt. 31-15, p. 69.) This may be a re-submission of the previously rejected grievance.

This grievance was accepted, even though it contained the same content that was rejected when it was the subject of Grievance number IC 120001230. This new grievance was assigned number IC 120001427, and was granted in part at the Level 1 response: "[Y]our concerns have been taken serious [sic] and consultation and education will be provided as necessary. Thank you for communicating your concerns, and staff would like to offer you an opportunity to come back to the program to further your own personal treatment and goals, upon appropriate timing." (Dkt. 31-15, p. 62.) The Level 2 responder concurred.

### F.     Appeal of November 27, 2012 (No. IC 120001626)

Dissatisfied with that response, on November 14, 2012, Plaintiff filed an appeal of the decision in IC 120001427 (that he was being denied rehabilitation programs and being subjected to cruel and unusual punishment) (Dkt. 31-15, p. 56), which was given number IC 120001626 when it was converted into an electronic grievance appeal (Dkt. 31-15, pp. 28-29.) That appeal was rejected for the following reasons: it was not "civil," it contained "personal attacks," and the same issue was previously grieved under IC 120001426. (Dkt. 31-15, p. 55.) On November 27, 2012, Saade provided Plaintiff with a rejection notice explaining these rejection reasons. (Dkt. 31-15, p. 55.)

As to Saade's representation that the subject of the grievance was already fully exhausted, it must be noted that Grievance No. IC 120001426 was about Grievance

Coordinator Saade's subversion of the grievance systems, while No. IC 120001427 was about how Counselor Sonnier treated him in the TC program. The subject matter of each was distinct, and yet Plaintiff was told that complaining about subversion of the grievance process completed the administrative grievance procedure for complaining of the maltreatment in the TCP. That characterization is to Plaintiff's advantage: both Saade's subversion of the grievance process[3] and Sonnier's treatment of Plaintiff in the TCP are deemed fully exhausted in the administrative grievance system.

### G.    Plaintiff's Offender Concern Form to Warden Blades

When Plaintiff's appeal was rejected for the type of language he used, Plaintiff appears to have spoken to his new IDOC Warden, Randy Blades, after Plaintiff's removal from the private prison TCP and his transfer to IDOC's maximum security institution. On December 6, 2012, Plaintiff submitted a concern form to Warden Blades, noting, "Attached is the grievance I spoke to you of ICC," and complaining that "Saade still doesn't want to process my grievance from there at ICC. Denying it & highlighting "gay" as if I can't say that word. Absurd!" (Dkt. 34-5, p. 3.) Warden Blades' response to the concern form was "Forwarded this issue to the contract monitor for IDOC." Defendant argues that using only this concern form was not enough, and that Plaintiff did not attempt to grieve or appeal the particular issue that Saade allegedly violated Plaintiff's First Amendment free speech rights. (*Id*.)

---

[3]        This access-to-courts-type claim is *not* the claim Plaintiff brought in his § 1983 complaint against Saade in this case. Rather, Plaintiff brought the claim that occurred as a result of Saade rejecting his grievance because it contained the word "gay," a free speech claim. Therefore, his exhaustion of the former issue does not mean that he exhausted the latter issue.

**MEMORANDUM DECISION AND ORDER - 13**

H.    <u>Analysis</u>

The Court concludes that the issue of whether Plaintiff was excused from exhausting the grievance process at ICC must be decided in light of the foregoing history and in light of the purposes for exhaustion of the prison grievance process. The grievance system was to designed to apprise Ms. Saade's supervisors and employer that she may have violated Plaintiff's First Amendment right to free speech. While that also may have been accomplished through IDOC's Randy Blades' forwarding of the offender concern form to the IDOC ICC contract monitor, and the ICC contract monitor subsequently notifying Ms. Saade's ICC supervisors and employer, the record lacks any information showing that the free speech complaint ever actually was communicated from an IDOC warden to the ICC supervisors. The record does not show that Plaintiff followed up with Blades, the ICC contract monitor, the ICC supervisors, or ICC to determine whether they received and addressed his free speech complaint.

The correct way to apprise Ms. Saade's supervisor of her action was to use the grievance system. Inmates may certainly attempt to informally solve their issues in ways other than the grievance system for the sake of problem-solving, but those efforts do not equal administrative exhaustion under the law.

The record shows that, when used properly, the grievance system worked. When Plaintiff had earlier complained that Ms. Saade was "subverting" the grievance system, she forwarded that grievance to her supervisors, and it was answered at Levels 1, 2, and 3. Further, when Plaintiff filed a grievance about the counselor's conduct, ICC officials granted the request in part, thanked him for bringing the conduct to their attention, and

said they would correct such conduct by providing additional training to their staff. Therefore, there is no evidence in the record that, had Plaintiff submitted a free speech grievance to Ms. Saade about her own behavior, that she and other ICC officials would not have processed it and considered its content.

The Court concludes Plaintiff did not sufficiently exhaust his First Amendment claim against Saade. After Plaintiff heard nothing regarding his offender concern form to Blades (who was not a part of the ICC system), the grievance procedures require the inmate to submit the unanswered or un-remedied offender concern form with a grievance to begin the regular grievance process with ICC and take it to the highest level of appeal ICC would allow. ("Grievance and Informal Resolution Process for Offenders Offender Handout, Dkt. 31-10, p. 11.) Plaintiff's grievance log shows that he regularly used the grievance system and knew how to properly exhaust his administrative remedies. The record also shows that he knew that he could grieve about *how* Ms. Saade processed grievances, because he had already done that once with the "subverted grievance process" grievance.

The Court clarifies that Plaintiff has not brought a § 1983 access-to-courts claim that Saade was thwarting his efforts to file grievances, nor could he be successful if he did so, because (1) he could have made an effort to correct the problems she identified with his grievance attempts, and (2) a number of Plaintiff's correct grievances about the TCP and Saade's handling of grievances were processed, and some relief granted regarding the TCP.

**MEMORANDUM DECISION AND ORDER - 15**

In this action, the only claim brought against Saade is the free speech claim. As a result of the foregoing reasoning, the Court concludes that there are no genuine disputes of material fact and the free speech claim against Defendant Saade is subject to dismissal without prejudice for failure to exhaust administrative remedies. However, the same discussion shows that Plaintiff *has* exhausted his administrative remedies as to Defendant Sonnier, who has not yet appeared to defend this case.

The Court now turns to Defendant Reinke's Motion for Summary Judgment.

## MOTION FOR SUMMARY JUDGMENT:
## MOOTNESS OF INJUNCTIVE RELIEF CLAIMS

Defendant Brent Reinke remains in this lawsuit for the purpose of effectuating any injunctive relief Plaintiff might obtain in this action. Defendant Reinke alleges that injunctive relief is no longer possible, because Plaintiff was already moved to the rehabilitative pathway he sought, the facility where the alleged wrongs occurred is no longer operated by ICC, Defendant Sonnier is no longer employed at ICC and was not retained by IDOC to be a rehabilitative counselor, and Reinke has no control over whether Plaintiff is granted parole in the future.

In response, Plaintiff submitted the declarations of several inmates who state that IDOC rehabilitative programs in use in 2015 employ the same tactics of requiring men whose views are contrary to homosexuality (for religious or other personal reasons) to engage in effeminate and sexually-oriented behaviors with other men or risk losing their place in the program, which results in losing their tentative parole dates. For example, inmates complain that the following questionable behavior was required of them to

remain in the ICC and/or IDOC rehabilitative programs: (1) sing "I'm a Little Teacup"';

(2) sing "I'm a Barbie Girl in a Barbie World"; (3) peck like a chicken eating feed; (5)

walk down a runway like a female model; (6) act like a "Valley girl"; (7) act like a

winner in the Miss America pageant; (8) participate in a dance off where men rub their

bodies against each other and "twerk" on the floor; (9) pretend to lick a popsicle; (10)

pretend to be a female breaking up with her boyfriend; (11) drag one's buttocks across

the floor like a dog that has worms; (12) pretend to eat a burrito with the contents falling

out, which was designed to mimic fellatio; and (13) play "piggly-wiggly," which means

to get down on all fours and shake one's buttocks and snort like a pig in front of a crowd

of men. (Inmate Declarations, Dkt. 45-2, 45-3, 45-4.) One inmate reported that the "staff

would cheer and encourage me to do it with claps and whistles and praise." (Declaration

of Florencio Noah, Dkt. 45-3, p. 8.)

 In addition, an inmate complained that counselors attribute homosexuality to

heterosexual inmates in the IDOC rehabilitative programs, and the program rules prevent

them from responding if they disagree; for example, Counselor Frei called an inmate a

"bitch" and said that he "must be gay because of all the time that he had done."

(Declaration of Joseph Sena, Dkt. 45-2, p. 9.)

 The foregoing allegations could have First Amendment implications for

prospective injunctive relief. The allegations that these policies are ongoing in the IDOC

rehabilitative programs causes the Court presently to reject Reinke's request to dismiss

the prison official who could put into effect any order of injunctive relief in this case.

**MEMORANDUM DECISION AND ORDER - 17**

Injunctive relief "is designed to deter future misdeeds, not to punish past misconduct." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990). A district court "has 'broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may be fairly anticipated from the defendant's conduct in the past.'" *Id*. (citing *N.L.R.B. v. Express Publishing Co.*, 312 U.S. 426, 435 (1941)).

Here, the Court concludes that the official capacity claim should not be dismissed for mootness at this stage, because Defendants draw the scope of potential relief too narrowly. Should the IDOC demonstrate that new policies and procedures have been put into effect that make it unlikely that the same type of alleged violations might happen in the future, then the claim for prospective injunctive relief may be moot. For example, the Court is aware that the Idaho Department of Correction recently announced that it has discontinued all of its "shame-based" therapeutic community rehabilitative programs and has determined that it would clarify its pathways to parole.[4]

Because Reinke is no longer IDOC director, the Court will permit him to be removed from the lawsuit and Director Kevin Kempf to be substituted in his stead, for purposes of prospective injunctive relief only.

The Court agrees with Defendant Reinke that there are insufficient facts supporting Plaintiff's request to widen his claims against Reinke to include a personal

---

[4]      See Cynthia Sewell, *Kempf ushers in new era for Idaho Department of Correction*, Idaho Statesman, Sept. 18, 2015 (online); Betsy Z. Russell, *Idaho prisons halt treatment program that actually was leading to more recidivism*, The Spokesman-Review, Sept. 22, 2015 (online); Rebecca Boone, *Idaho to revamp prison treatment programs*, Associated Press, Sept. 18, 2015. The Court cites to these sources only to demonstrate that the IDOC has made public announcements regarding changes to its rehabilitative programs and pathways.

**MEMORANDUM DECISION AND ORDER - 18**

capacity claim. While there may have been other suits complaining about the TC program's content, Plaintiff has pointed to none alleging that the TC program violated a First Amendment right of free speech regarding the right to hold and express an opinion about homosexuality that differs from that of the TC counselors, or the right to be free from being forced to engage in types of behaviors contrary to their personal or religious viewpoints to be eligible to remain in the program, which is a different method of coercing inmates to adopt the viewpoints of their counselors. Reinke's Motion for Summary Judgment will be granted in part, and denied in part. Finally, Plaintiff's allegations that his parole pathway was changed in retaliation for filing his lawsuit amounts to an unexhausted new claim that must be brought in a different lawsuit after exhaustion of administrative remedies.

## PLAINTIFF'S MOTION FOR SERVICE

Plaintiff has provided an alternative address for service upon Jaune Sonnier. Accordingly, the US Marshal's Service shall attempt service upon Ms. Sonnier at 4540 Delridge Way, SW, Seattle, Washington, 98206-1327. Plaintiff's alternative motion for service by publication is denied without prejudice, as attempting personal service at the above address is a better present alternative.

**MEMORANDUM DECISION AND ORDER - 19**

## AVAILABILITY OF ALTERNATIVE DISPUTE RESOLUTION

The parties are encouraged to discuss settlement of the claims among themselves, including any new claims of "retaliation" regarding Plaintiff's pathway, given the IDOC announcement that "shame-based" rehabilitative programs would be discontinued and the pathways to parole would be clarified. The parties are given notice that alternative dispute resolution (ADR) is available at any stage of the proceedings, including via videoconference (where available) or teleconference, to facilitate the process among parties at different locations.

The Court expresses no opinion as to the future success or failure of Plaintiff's remaining claims. If the parties are unable to resolve their issues themselves through negotiation and desire to engage in a judicial settlement conference or mediation, they should file a stipulation so stating.

## ORDER

**IT IS ORDERED:**

1. Defendant Saade's Motion for Summary Judgment and Reinke's Joinder (Dkt. 31, 44) are GRANTED, and claims against her are DISMISSED without prejudice.

2. Defendant Reinke's Motion for Summary Judgment (Dkt. 42) is GRANTED in part as to Defendant Brent Reinke, but DENIED in part to the extent that Defendant's counsel shall file a notice substituting in Kevin Kempf as IDOC Director in his official capacity for prospective injunctive relief purposes only.

3. Plaintiff's Motion for Service (Dkt. 49) is GRANTED in part and DENIED without prejudice in part.

4.  The Clerk shall issue a summons and provide copies of the Complaint and a copy of the Order granting in forma pauperis status (Dkt. 3, 28) to the United States Marshals Service for service of the Summons and Complaint upon Jaune Sonnier at her last known address of 4540 Delridge Way, SW, Seattle, Washington, 98206-1327.

5.  The Court will set a separate discovery and dispositive motion deadline for Defendant Sonnier upon her appearance. At any time, Defendant Kempf may renew a dispositive motion demonstrating why Plaintiff's claims for prospective injunctive relief are moot, if Defendant has facts to support such a defense.

DATED: September 28, 2015

B. Lynn Winmill
Chief Judge
United States District Court

**MEMORANDUM DECISION AND ORDER - 21**