UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ELIAS CUSTODIO,<br><br>               Plaintiff,<br><br>vs.<br><br>IDAHO STATE BOARD OF CORRECTIONS, DIRECTOR IDAHO STATE DEPARTMENT OF CORRECTIONS, BRENT REINKE, IDAHO STATE COMMISSION OF PARDONS AND PAROLES, OLIVIA CRAVEN, COUNSELOR SONNIER, MRS. SAADE,<br><br>              Defendants. | Case No. 1:13-cv-00332-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court in this prisoner civil rights matter are Kevin Kempf's Motion for Summary Judgment and Defendant Jaune Sonnier's Motion for Summary Judgment. (Dkt. 60, 62.) The motions are fully briefed and ripe for adjudication.

Having fully reviewed the record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, the Court will decide this matter on the written motions, briefs and record without oral argument. D. Idaho L. Civ. R. 7.1(d).

**MEMORANDUM DECISION AND ORDER - 1**

# INTRODUCTION

Plaintiff's claims arise from his participation in and removal from a prison rehabilitation program, the Lifeline Therapeutic Community Program (TCP), where he resided for 37 days in June and July of 2012. Completion of the TCP was required to qualify for parole.

Understanding the rehabilitative theory behind a "therapeutic community" is essential to analyzing this case. The IDOC Standard Operating Procedure (SOP) governing its TCP provided:

> TC programs are designed and structured to create an environment for social learning and change. The TC is an environment that provides a residential, 24-hour per day, seven (7) days a week, intensive learning experience in which TC participant's behaviors, attitudes, values, and emotions are continually monitored, and corrected or reinforced as part of the daily regime. The role of TCs is to re-socialize TC participants according to positive values and right living lifestyles.
>
> A critical clinical element of the TC is the peer community itself. According to the positive values and principles established and taught by the TC, peers confront inappropriate behavior and support appropriate behavior amongst each other. In contrast to traditional programs, which rely on individual or group counseling sessions, the powerful agent of change in a TC is the TC participants and the social learning process. In the TC, the primary function of staff members is that of role models for change, guides for recovery, and managers of the TC process.

(Dkt. 62-4, p. 3, SOP 607, General Requirements, § 1.)  While these are indeed legitimate penological goals, Plaintiff claims that the program and its therapists were abusive and promoted homosexuality to the point of violating his constitutional rights.

1.      **Alleged Abusive Nature of the TCP**

The allegations of abuse in the TCP seem to be a natural by-product of the fact

that a therapeutic community experience is intended to shock an addict into sobriety. One

commentator described it as follows:

> The TC route to getting sober is a unique path and it is not right for everyone. Described as rigid, cult-like, or even downright abusive by some, for other people, these "cons" of this approach are its "pros."

> [A] downside[] or challenge[] to embracing the TC approach [may include] [t]he "attitude." That boot camp style rigidity and the in-your-face confrontational attitude is not present in every TC, but it has become the stereotype of the model for a reason. This very black and white, right or wrong, approach to getting sober can be just what the doctor ordered for someone who has tried everything else, but be forewarned, it can be a deal breaker for some people.[1]

Generally, TCPs should "prohibit public humiliation, physical punishment, and the

withholding of sleep, food, water, and the use of the toilet."[2] The IDOC SOP provides

that "[a]ll TC staff members shall role model right living ... for the TC and each other, ...

and TC staff members who consistently role model inappropriate behaviors and attitudes

that are incongruent with right living shall be subject to [discipline]." (Dkt. 62-4, p. 9.)

Plaintiff and other prisoners allege that standard fare for the TCP therapists

included shouting, "Shut the fuck up!" to participants and calling them "no good pieces

of shit." (Depo. P. 56.) Plaintiff was confronted for manipulating the system so that he

---

[1]      This generic description is found at http://www.christiandrugrehab.com/christian-recovery/therapeutic-community. The concept of a "therapeutic community" does not necessarily contain religious elements.

[2]      Barry R. McCaffrey, Director of the Office of National Drug Control Policy. "Therapeutic Communities in Correctional Settings: The Prison Based TC Standards Development Project." (December 1999), https://www.ncjrs.gov/ondcppubs/publications/pdf/therap_comm.pdf.

**MEMORANDUM DECISION AND ORDER - 3**

could use the bathroom, because excusing oneself to go to the bathroom during the course of a two- or three-hour meeting was generally prohibited. (Dkt. 62-9, p. 13, Plaintiff Depo. p. 113.)

TCP participants like Plaintiff constantly questioned whether they were being taught "right-living" or being abused: "Never in my life have I been so disrespected, dehumanized, demoralized, and downright abused mentally." (Affidavit of Timothy Forgett, Dkt. 68-1.) "There is no doubt in my mind that the T.C. Program failed me. Not only did it fail me, but I believe it injured me even further…. I also had serious mental health issues that were not addressed at all. And in fact, the symptoms of my mental illness were allowed to grow to uncontrollable proportions while in the program." (Affidavit of Mark Cornelison, Dkt. 8-2.) Plaintiff also alleges he was not permitted to communicate with his family or regularly exercise.

**2.    Allegations that the TCP Compelled Inmates to Adopt Therapists' Point of View on Homosexuality**

Beyond the general allegations that TCP therapists abused him, Plaintiff alleges that Ms. Sonnier and the TCP promoted homosexuality and required prisoners to agree that it is an acceptable lifestyle, in violation of his First and Fourteenth Amendment rights. Plaintiff complains that he was forced to participate daily in "image breakers" exercises, which consisted of role-playing with both overt and covert homosexual tones, such as dancing with and "grinding" against other inmates. Participants also reported that, when therapists forced them to mimic stereotypical "women," such as fashion models,

**MEMORANDUM DECISION AND ORDER - 4**

"Valley girls," or cheerleaders, the therapists often catcalled and whistled—counterproductively modeling disrespectful and ill-mannered societal behavior.

### 3.    Plaintiff's Allegations Supporting his Claims

As part of Plaintiff's rehabilitative process, the Idaho Commission of Pardons and Parole (ICPP) required Plaintiff to participate in the IDOC's TCP. Plaintiff was granted an open tentative parole date by the ICPP, conditioned upon completion of the TCP.

Plaintiff was bewildered by the bizarre nature of the TCP from the start. He alleges that he was not able to complete the TCP, because he was removed when the counselor in charge of the program, Defendant Sonnier, found his language unacceptable when he tried to explain that he "was not a 'gay,' or homosexual. That [he] was a straight guy." (Complaint, Dkt. 3, p. 4.) Plaintiff explained that, when he was on the "hot seat," and inmates aggressively questioned him about what he meant by being a "straight up, solid man," he responded that he was not a "queer" or a "punk." (Dkt. 3-1, p. 6.)

Plaintiff alleges that Defendant Sonnier, a lesbian, became angry, slapped the wall, and said, "that makes my blood boil." (Dkt. 3, p. 4.) Plaintiff alleges that Defendant Sonnier removed him from the TCP, placed him in segregation, and issued a disciplinary offense report (DOR) for his language. Plaintiff sought to be reinstated in the program or to be assigned to a different counselor, but he was denied that opportunity.

Plaintiff was not permitted to visit with his family for the 37 days he was in the TCP. In addition, he alleges that Sonnier generally told the prisoners to forgo their exercise/recreation time, or they could be removed from the program, and that he was

denied exercise/recreation during three specific time periods within his 37-day stay in the TCP.

### 4.     Disbanding of the Idaho TCP

After Plaintiff and several other prisoners filed TCP lawsuits and new prison administrators took over prison operations, the TCP was disbanded, and the prison rehabilitative programs substantially changed. New administrators had obtained empirical data showing that offenders who completed the program were *more likely to re-offend* than those who had not been involved in the program.[3] After reading the numerous inmate affidavits detailing the indignities inmates suffered under the guise of "treatment," the Court is not surprised by the increased recidivism rate.[4]

Yet, the federal Constitution is concerned with only grievous wrongs. For example, verbal abuse does not rise to the level of a constitutional violation,[5] although prolonged verbal abuse that amounts to calculated harassment may be actionable under the Fourteenth Amendment. The underlying question posed in this lawsuit is whether a

---

[3]     See Cynthia Sewell, *Kempf ushers in new era for Idaho Department of Correction*, Idaho Statesman, Sept. 18, 2015 (online); Betsy Z. Russell, *Idaho prisons halt treatment program that actually was leading to more recidivism*, The Spokesman-Review, Sept. 22, 2015 (online); Rebecca Boone, *Idaho to revamp prison treatment programs*, Associated Press, Sept. 18, 2015.

[4]     Plaintiff noted in deposition that other similar programs have also been abandoned, such as the Moral Recognition Therapy (MRT) program, which—unlike the "public inquisition"-like atmosphere in the TCP (Dkt. 62-9, p. 5, Depo. p. 56)—was "just kind of like one counselor degrading you," that is, where the inmates "were belittled by the counselor, but no other people." (Dkt. 60-3, p. 27, Depo. p. 147.)

[5]     *See Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (holding that "[v]erbal harassment or abuse [of a prisoner] ... is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983."); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir.1987) (holding that prisoner's allegations of threats allegedly made by guards failed to state a cause of action).

**MEMORANDUM DECISION AND ORDER - 6**

consensual but mandatory-for-parole rehabilitation program that resembled a military boot camp infringed on the basic constitutional rights of a prisoner.

## PROCEDURAL BACKGROUND AND CLAIMS AT ISSUE

Earlier in this matter, the Court granted summary judgment on all claims against Defendant Barbara Saade for failure to exhaust administrative remedies, and all personal capacity claims against former IDOC director Brent Reinke and his successor, Kevin Kempf, for failure to show that either director personally participated in the alleged violations. The remaining claims are as follows: (1) a First Amendment free speech claim against Jaune Sonnier in her personal capacity for allegedly punishing Plaintiff for his exercise of free speech; (2) a Fourteenth Amendment equal protection claim against Ms. Sonnier in her personal capacity alleging that she discriminated against him because he refused to be compelled to adopt the position that homosexuality is an acceptable alternative lifestyle; (3) a First Amendment freedom of association claim against Ms. Sonnier in her personal capacity regarding restrictions on Plaintiff's visitation with his family; (4) an Eighth Amendment cruel and unusual punishment claim against Ms. Sonnier in her personal capacity for failing to permit Plaintiff adequate exercise and recreational time while in the program; (6) a First Amendment claim that the prison rehabilitation programs continue to violate Plaintiff's First Amendment right to free speech, asserted against IDOC Director Kevin Kempf in his official capacity; and (7) a Fourteenth Amendment claim that the programs continue to violate Plaintiff's equal protection rights, asserted against Director Kempf in his official capacity.

**MEMORANDUM DECISION AND ORDER - 7**

## SUMMARY JUDGMENT STANDARD OF LAW

Summary judgment is appropriate where a party can show that, as to a particular claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, there must be a *genuine* dispute as to a *material* fact essential to an important element of the cause of action or defense to survive summary judgment. Disputes over facts that are not material to the resolution of the motion will not preclude summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)

**MEMORANDUM DECISION AND ORDER - 8**

& (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

**5.      First Amendment Free Speech Claim against Jaune Sonnier**

Plaintiff alleges that Ms. Sonnier's punishment of him for the type of language he used and the manner in which she operated the TCP violated his First Amendment right to free speech. Sonnier asserts that regulation of Plaintiff's speech does not violate the Constitution because Plaintiff's assertions were not protected speech, given that the regulations were part of a rehabilitative program to teach Plaintiff "right living" to qualify for release on parole. In her briefing, Sonnier has mischaracterized this claim as a retaliation claim instead of a denial of free speech claim; however, she uses the *Turner* factors in her legal analysis, which are properly applied to a free speech claim.

### A.  Standard of Law

In *Turner v. Safley*, 482 U.S. 78, 89 (1987), the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." This deferential standard was deemed necessary "prison administrators ..., and not the courts, [are] to make the difficult

judgments concerning institutional operations." *Id.* (citation omitted). Under *Turner v. Safley*, federal district courts review four factors when a prison regulation or practice impinges on a First Amendment right of a prisoner: (1) whether there is a "rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "there are alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether "ready alternatives" at a "de minimis cost" exist, which "may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id.* at 89-93 (internal quotation marks omitted).

### B. Discussion

As to the first factor, Sonnier asserts that she was attempting to teach Plaintiff that his use of the words "punk" and "queer" were inconsistent with the "right living" goal of the TCP. "Right living" is aimed at "defin[ing] the appropriate way of behaving and interacting with others and contrast[ing] the counter-productive attitudes and behaviors that inmates practice." (Dkt. 62-3, p. 4, Sonnier Affidavit; Dkt. 62-4, SOP 607.)

Had Sonnier confronted Plaintiff for stating merely that he was not "gay" or "homosexual," there may be a genuine dispute as to a material fact with respect to this first *Turner* factor. However, there is a rational connection between not permitting inmates in a rehabilitative program to use crude and derogatory terms to describe different lifestyles and society's interest in promoting tolerance (which is not the same as *acceptance*) of a lifestyle different from one's own.

**MEMORANDUM DECISION AND ORDER - 10**

The second factor is whether Plaintiff had an alternative means of exercising the right that remained open. Plaintiff was participating in a "closed-campus" rehabilitative program that—for the duration of the program only—limited his ability to communicate with inmates outside the program. He was also limited in his communication with the outside world during the "blackout" orientation phase of the program, as it was designed to be an intensive reflective period without outside distractions. Family visitation was to be reinstated after the orientation phase. Plaintiff had little choice in whether to participate in the program if he wanted to qualify for parole; as the record reflects, when he voiced his opposition to the program, he was denied an alternative means to meet the parole requirement.

However, this was a program of relatively short duration compared to Plaintiff's life sentence, and thus Plaintiff could express his non-acceptance of a different lifestyle during all other periods of his incarceration. Within the program, as soon as his orientation phase was completed, he could also express his views orally and in writing to his family and friends who visited him.

This case is distinguishable from *Bradley v. Hall*, 64 F.3d 1276, 1281-82 (9th Cir. 1995), where the Court of Appeals for the Ninth Circuit held that accessing the courts was such an important right that prison officials should not be permitted to punish prisoners for using "hostile, sexual, abusive, or threatening" language in a written grievance. The Ninth Circuit's balancing test used to give more weight to the importance of a grievance than to the importance of the penological interest set forth by the prison in *Bradley* was overruled by *Shaw v. Murphy*, 532 U.S. 223 (2001). The *Shaw* opinion

**MEMORANDUM DECISION AND ORDER - 11**

clarified that "the *Turner* test, by its terms, simply does not accommodate valuations of content. On the contrary, the *Turner* factors concern only the relationship between the asserted penological interests and the prison regulation." *Shaw*, 532 U.S. at 230.

The Ninth Circuit revisited an issue similar to *Bradley* after *Shaw* was decided. In *Brodheim v. Cry*, 584 F.3d 1262 (2009), the Court came to the same conclusion as in *Bradley*, applying only the four *Turner* factors. Importantly, both *Bradley* and *Brodheim* drew a distinction between the act of writing disrespectful words in a grievance directed to prison officials and the legitimate interest a prison has in "prevent[ing] any open expression of disrespect or any disrespectful communication between prisoner and guard or between prisoner and prisoner." *Brodheim*, 584 F.3d at 1273 (citing *Bradley*, 64 F.3d at 1281).[6]

The third *Turner* factor is gauging the potential impact on prisoners and correctional staff if inmates in the rehabilitation program were permitted to use crude and derogatory terms to describe different lifestyles. It is easy to foresee that arguments or even physical violence might occur if inmates were allowed to verbally denigrate people based on sexual orientation, race, religion, national origin, or other factors. Counselors would have a difficult time teaching inmates important social skills, and other inmates who are supposed to be part of the community "family" would not receive the full benefit of rehabilitative therapy if the program tolerated disrespectful language. Additional

---

[6]     The prison also attempted to regulate Plaintiff's speech on this issue in the grievances he submitted. Plaintiff included this as a free speech claim against Defendant Saade, but, as discussed above, he failed to exhaust his administrative remedies as to this claim, and it was dismissed without prejudice.

security resources likely would have to be allocated to the rehabilitation unit if inmates were permitted to denigrate each other without penalty.

The fourth factor is whether "ready alternatives" at a "de minimis cost" exist, which may signal that the regulation is merely an exaggerated response to prison concerns." Because it is generally unacceptable in prison to denigrate other lifestyles or personal attributes of other inmates or prison staff *out loud*, *see Bradley* and *Brodheim*, *supra*, and it is especially inconsistent with a peer-based rehabilitative program, there is no ready alternative to disallowing such verbalizations. The basic prison rule against verbalizing disagreements in socially unacceptable ways is not an exaggerated response to a legitimate prison concern.

Plaintiff argues that all of the reasons put forth by Ms. Sonnier for his removal from the TCP (that violation of various TCP rules)amount to a guise to cover her true motive of removing him only for failing to adopt her point of view on homosexuality.[7]

---

[7]     Plaintiff is correct that some of the TCP rules were confusing. Inmates were asked both to "be their brother's keeper" and to refrain from enabling others. Where the line was drawn was up to the therapist facilitating the particular activity surrounding an inmate's behavior.

However, other reasons specified for Plaintiff's removal find support in the record. One of the reasons was that Plaintiff's life story demonstrated "a lack of remorse for his victims and his past criminal behaviors." (Dkt. 62-3, p. 10.) Plaintiff's unrelated parole records reflect the same.  The ICPP Minutes of September 12, 2013, describe the hearing conclusions:

> Subject shot three people committing his crime. Commissioner Scheihing said that referring to his victims as "two white boys" is ridiculous. He knows subject has done much time and some of that language comes from incarceration, but subject needs to rethink this. Subject noted that was brought [] to the awareness in TC and he admits they were two human beings. The Commissioner told him when he used that term—he shot two white boys—it sounded as though he was proud of it. He needs to be better than that if he wants to get out.

(Dkt. 60-7, p. 8.) It is interesting that Plaintiff acknowledged to the ICPP that the TC helped him gain an awareness that he needed to be more remorseful about his victims' deaths, and yet, here, he does not

**MEMORANDUM DECISION AND ORDER - 13**

This argument still does not address the fact that Plaintiff used clearly inappropriate language—which was identified by therapists and inmates alike—that warranted discipline. This undisputed fact prevents him from being able to prove that the regulation of his speech was not reasonably related to a legitimate penological interest. Because the *Turner* factors support Ms. Sonnier's action in calling into question Plaintiff's use of the words "punk" and "queer" during his peer review, Ms. Sonnier is entitled to summary judgment.

**6.     Fourteenth Amendment Equal Protection Claim against Ms. Sonnier**

Plaintiff's next claim is that Ms. Sonnier violated his Fourteenth Amendment right to equal protection, based on the allegation that Ms. Sonnier discriminated against him because he refused to adopt the position that homosexuality is an acceptable alternative lifestyle.

### A.  Standard of Law

An equal protection claim may be established by showing that the defendant intentionally discriminated against the plaintiff based on the plaintiff's membership in a protected class, *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

---

acknowledge that his lack of remorse in his life story was a legitimate reason for his removal from the program.

In addition, as to the equal protection of free expression of speech, the United

States Supreme Court has opined:

> Under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an equality of status in the field of ideas, and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.

*Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

### B. Discussion

Plaintiff based his equal protection claim on several different factors. One is that

Ms. Sonnier removed him from the program for expressing his viewpoint that he was

personally opposed to homosexuality. Another is the contrast between the therapists

expressing support and compassion to another inmate who revealed to the group that he

had been repeatedly raped by his former cellmate, and the therapists becoming angry and

removing Plaintiff from the program for revealing to the group that he was opposed to

homosexuality.

Because Plaintiff is not alleging that he is a member of a protected class, he must

show there is a genuine dispute regarding whether he was treated differently from

similarly situated individuals without a rational relationship to a legitimate state purpose.

Plaintiff is entitled to equal protection of the law regarding his beliefs about what

constitutes an acceptable lifestyle. If prison officials articulated merely an irrational or

arbitrary reason for removing Plaintiff from the TCP, then he would be entitled to proceed to trial. That is not the case, however.

Plaintiff has not brought forward sufficient evidence showing that TCP staff permitted other TCP participants to use crude or derogatory terms to describe different lifestyles or personal attributes, and chose to censor or punish only Plaintiff. When asked in deposition whether he knew if any other inmate was removed from the TCP for "expressing what might be perceived as an anti-gay remark," Plaintiff responded that he didn't know. (Dkt. 60-3, p. 18, Depo. pp. 79-80.)

A legitimate penological reason for how each inmate was treated is evident from Plaintiff's own description of what happened. One of the primary purposes of the program was to help prisoners self-evaluate, and so "every day, you'd have to ... get up on the stand on the podium in front of 100 men. And you'd have to tell something about your life or your experience and what you want from the program." (Dkt. 62-9, p. 2, Depo., p. 18.) To participate in this exercise, inmate Jay Fuller "got up there and he had said that for the last few months before he had come into the TC program that his cellmate had been raping him every night over in Unit 15 here.… And he went on for quite some time, probably about 45 minutes of crying about how he'd been raped nonstop and that he wanted to share all that with us." (*Id*., p. 20.)

Plaintiff stated in deposition that Fuller said he had told the Unit 15 officers about the rape, but they told him he would have to be moved to segregation if they reported it. Fuller said he did not want to go to segregation, and so he just went ahead and participated in the sexual behavior until he was moved into the TCP. Plaintiff classified

the incident as homosexual participation rather than sexual assault. (*Id.*, p. 3, Depo. p. 22.) Plaintiff believes the counselors were supporting Fuller's "voluntary" participation in the homosexual activity because the counselors "cheered [Fuller] on," and "basically patted him on the back and told him that it was all good." (*Id.*)

Contrarily, when Plaintiff said he wasn't a punk or a queer, Sonnier asked the group of prisoners, called "family members," whether they had anything to say. Inmate Rock Ferula said: "He's got criminal pride and GP [general population] mentality. He can't do a program like this." (Dkt. 62-9, p. 9, Depo, p. 71.) Another family member, Jay Fuller, the man who had disclosed that he was raped by his cellmate, said, "I don't think he can be in the family." (*Id.*, Depo, p. 72.) One of the purposes of the program was to abandon "characteristics learned on the 'streets' and in the general prison population, including isolation, braggadocio, [and] exaggerated machismo." (Dkt 62-3, p. 3, Sonnier Decl.) Ferula identified Plaintiff's language as being inappropriate prison slang.

Because in each instance Plaintiff has identified a legitimate penological purpose for the manner in which each inmate was treated, his equal protection claim fails a rational basis analysis. Contrary to Plaintiff's position, it is clear that a confession that a prisoner had been repeatedly raped by his cellmate was well within the stated program purpose, but using crude and denigrating "general population" language to describe other lifestyles is not.

Further, the Court agrees with Sonnier that the "hot seat" was not a regular forum where free speech principles reigned above the legitimate penological interests of the therapeutic community. Instead of being a public forum, the purpose of participation in

**MEMORANDUM DECISION AND ORDER - 17**

the closed therapeutic community was to learn how to get along with others in a close-knit community, and the purpose of the hot seat was to determine how inmates would be able to function in society under pressure. Allowing prisoners to say anything they wanted would not serve the therapeutic ends of the program.

The Court agrees with Plaintiff that Sonnier's cited supporting case, *Snead v. Perry*, 2014 WL 6749553 (W.D. Mich. 20414), is based on a different set of facts—a requirement that a prisoner admit responsibility for his crime before being permitted to participate in a rehabilitative program. Nevertheless, the same principle holds true here: because therapy and rehabilitation are arenas incompatible with complete free speech, a prisoner's free speech rights are necessarily limited in that narrow forum. *Cf. McKune v. Lile*, 536 U.S. 24 (2002) (holding there is no violation of the Fifth Amendment privilege against self-incrimination in a Kansas prison rehabilitation program requirement that inmates admit responsibility for their crime, because the program serves a vital penological purpose).

**7.       First Amendment Freedom of Association Claim against Ms. Sonnier**

Plaintiff alleges that Defendant Sonnier violated his right to freedom of association because she forced him to give up his right to visit with his family to participate in the TCP. An intensive 24/7 program, the TCP was intended to last between nine to twelve months. During the initial 30-day "blackout stage," no inmates were permitted visits or telephone calls with their families, as it was designed to be a time period of reflection without outside distractions.

**MEMORANDUM DECISION AND ORDER - 18**

### A.  Standard of Law

The United States Supreme Court has recognized:

> [A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Pell v. Procunier*, 417 U.S. 817, 822 (1974).

It is well-settled law that prisoners have no right to unfettered visitation under the federal Constitution, because "the necessary withdrawal or limitation of many privileges and rights" is "justified by the considerations underlying our penal system." *Id.*, 417 U.S. at 822 (1974); *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989). In fact, "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).

Nevertheless, some right to visitation with family members seems implicit in the Constitution. The United States Supreme Court has declined to define the parameters of that right:

> We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners. We need not attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration because the challenged regulations bear a rational relation to legitimate penological interests.

*Id.*, 539 U.S. at 131-32.

**MEMORANDUM DECISION AND ORDER - 19**

### B. Discussion

Plaintiff resided in the TCP for a period of 37 days. The TCP contemplated an orientation period of about thirty days without visitation from family members, designed to be a reflective rehabilitative period in a specifically-designated therapeutic program. Other restrictions included no games, no televisions, and no commissary purchases. Because this time period was a regular part of the program, prisoners were permitted to telephone their family members and notify them of the blackout period. There was a legitimate penological reason for the withdrawal of visitation privileges, and the time period was fairly short. Plaintiff's claim does not rise to the level of a violation of his First Amendment right to freedom of association. Accordingly, Plaintiff's freedom of association claim is subject to summary judgment.

### 8. Eighth Amendment Cruel and Unusual Punishment Claim against Ms. Sonnier for Failing to Permit Plaintiff Exercise and Recreation

Petitioner alleges that Defendant Sonnier denied him the right to exercise or participate in outdoor recreation during the 37-day orientation period in the TCP.

### A. Standard of Law

Exercise is a basic need protected by the Eighth Amendment. *Thomas v. Ponder*, 611 F.3d 1144, 1151 (9th Cir. 2010). "There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979). To deprive a prisoner of outdoor exercise during a period of long-

term, continuous segregation violates the Eighth Amendment. *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996).

"An Eighth Amendment claim that a prison official has deprived inmates of humane conditions must meet two requirements, one objective and one subjective." *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994). To meet the objective requirement, "the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities. The subjective requirement, relating to the defendant's state of mind, requires deliberate indifference." *Id.* (citations omitted).

In *Thomas v. Ponder*, the prisoner was denied exercise for 13 months and 25 days—a time period deemed sufficiently serious to constitute an Eighth Amendment violation. 83 F.3d at 1151. In fact, even a denial of outdoor exercise for six weeks is a "sufficiently serious" deprivation to support an Eighth Amendment claim. *See, e.g., Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (en banc). Similarly, in *Allen v. Sakai*, 48 F.3d 1082, 1086 (9th Cir. 1994), an allegation that an inmate was permitted only 45 minutes of exercise per week over a six-week time period was sufficient to warrant a jury trial on Eighth Amendment deliberate indifference.

### B. Discussion

Here, Plaintiff was in the TCP for five weeks. His deprivation of exercise was not continuous, but intermittent. The whole group was placed on "tight house" status for one or two weeks because some inmates had disobeyed prison officials. (Dkt. 62-9, p. 15, Depo., p. 105-08.) A second time, he was denied exercise was when he was "at the bus stop" for six hours, which was a period of compelled self-reflection; a third time, he was

banished to his bed under a "vow of silence" for three days for breaking a rule. (*Id.*) Generally, however, during his stay in the TCP, he was permitted to exercise outdoors for one to two hours per day, as opposed to three to four hours a day afforded to general population inmates. (*Id.*)

Plaintiff complains that Sonnier would yell, "'This is real serious. If you guys can't give up your rec'—and she would say something similar which was said about that in the real world you don't have time to go to rec because you've got your job and all that and that you can't get out. She'd yell to everybody: 'You guys can go to your rec, but you'll be out of here.'" (Dkt. 62-9, p. 12, Depo. p.110.) However, even if Sonnier pressured Plaintiff not to participate in outdoor recreation during his 37 days in the TCP, he did, in fact, participate in recreation for one to two hours per day, except for the three designated time periods above. (*Id.*, p. 11, Depo. p. 108.) Based on these undisputed facts, the Court concludes that, as a matter of law, the facts do not rise to a level of a constitutional deprivation.

**MOTION FOR SUMMARY JUDGMENT:**
**INJUNCTIVE RELIEF CLAIMS**

IDOC Director Kevin Kempf remained in this lawsuit for the purpose of effectuating any injunctive relief Plaintiff might obtain in this action regarding his placement and treatment in an appropriate rehabilitation program. The claims against Director Kempf are that the prison's offering of a single program that is a pre-requisite for parole that allegedly impermissibly impinges on Plaintiff's rights of free speech and equal protection under the First Amendment and Fourteenth Amendment because (1)

**MEMORANDUM DECISION AND ORDER - 22**

Plaintiff has a right to be free from being compelled to adopt the position that homosexuality is an acceptable alternative lifestyle, and (2) he should not be punished for his speech or for refusing to adopt the TCP instructors' point of view on social and political issues.

**1.      Standard of Law**

Injunctive relief "is designed to deter future misdeeds, not to punish past misconduct." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990). A district court "has 'broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may be fairly anticipated from the defendant's conduct in the past.'" *Id*. (citing *N.L.R.B. v. Express Publishing Co.*, 312 U.S. 426, 435 (1941)).

**2.      Discussion of Claims for Injunctive Relief**

Kempf now asserts that Plaintiff's claims for injunctive relief are moot because it is undisputed that the TCP been disbanded and the program components to which he objects are no longer in effect in the new IDOC programs. In addition, Plaintiff attended a TCP run by Corrections Corporation of America (CCA), a private entity that is no longer involved in corrections in Idaho. In support of his claims that the new rehabilitation programs are sufficiently different to render Plaintiff's claims moot, Kempf has submitted the Declaration of Teressa Baldridge. (Dkt. 60-4.)

In particular, Baldridge asserts that the following changes have occurred: (1) the rehabilitative program is no longer based on a community model; rather, inmates remain in their housing unit and come and go from the program; (2) there is no "hot seat"; (3)

**MEMORANDUM DECISION AND ORDER - 23**

there are no "image breakers" exercises; instead the new role plays are real-life scenarios, such as learning how to refuse an offer to do drugs; (4) there are no "tickets," "pull-ups," or "push-ups"; (5) there is no "bus stop" or "vow of silence"; (6) the Synanon group video that Plaintiff asserted is "brainwashing" is not used; and (7) participants do not have to recite the program philosophy each day.

Importantly, Plaintiff has come forward with no evidence that any part of the new program includes sexually-suggestive activities or that discussion of sexual orientation plays any part in the new programs. Defendant Sonnier no longer works as a prison rehabilitation therapist in Idaho. Plaintiff complains that other inmates have told him that completing a "fearless criminal inventory" (a long list of every crime and wrong an inmate ever committed) is required in the new rehabilitation program, but even if such an inventory was required, it does not follow that the IDOC's new program compels individuals to abandon their own stance on homosexual lifestyles or other social issues and to adopt the stance of their therapists.

Accordingly, because there is insufficient evidence in the record that the new programs contain the questionable elements at issue in this lawsuit, Kempf is entitled to summary judgment on the injunctive relief claims. There is no need for a prohibitory court order because inmates are no longer subjected to the alleged injustices of the TCP.

Finally, Kempf is also entitled to summary judgment as a matter of law as to Plaintiff's requested remedy of release from prison. The Supreme Court has made it clear that when a state prisoner seeks "a determination that he is entitled to immediate release or a speedier release from . . . imprisonment, his sole federal remedy is a writ of habeas

MEMORANDUM DECISION AND ORDER - 24

corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). Release from incarceration is not an available remedy in a § 1983 action.

## CONCLUSION

For the reasons set forth above, Defendants Sonnier and Kempf are entitled to summary judgment on all of Plaintiff's remaining claims. Plaintiff's pursuit of this lawsuit was not futile, however, because it brought to public light questionable practices of the Idaho Department of Correction that now are being corrected with the adoption of a new program aimed at learning respectful real-life interactions, which appears to be better-suited to accommodating inmates' civil rights.

## ORDER

**IT IS ORDERED:**

1.  Defendant Kempf's Motion for Summary Judgment (Dkt. 60) is GRANTED, and claims against him are DISMISSED with prejudice.

2.  Defendant Sonnier's Motion for Summary Judgment (Dkt. 62) is GRANTED, and claims against her are DISMISSED with prejudice.

DATED: September 29, 2016

B. Lynn Winmill
Chief Judge
United States District Court

**MEMORANDUM DECISION AND ORDER - 25**